IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID HATCHIGIAN, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | NO. 07-3217 |
| | : | |
| STATE FARM INSURANCE COMPANY, | : | |
| Defendant. | | |

MEMORANDUM

BUCKWALTER, S. J.                                                                             November 25, 2008

       Presently before this Court is Defendant State Farm Insurance Company's Motion for Summary Judgment, and Plaintiff David Hatchigian's Response to Defendant's Motion for Summary Judgment. For the reasons discussed below, the Motion for Summary Judgment is denied.

I. PROCEDURAL BACKGROUND

       On August 7, 2007, Plaintiff filed a Complaint alleging that Defendant, in bad faith, denied payment of insurance benefits "for a protracted period of time without cause" and "intentionally violated and breached the promise to deal in a fair and professional manner." (Pl.'s Compl. ¶¶ 23, 27.) Plaintiff seeks compensation in an amount equal to his claim for damages (punitive and compensatory) plus interest, attorneys' fees and costs. (Id.)

       On June 9, 2009, Defendant filed a Motion for Summary Judgment asserting that, Plaintiff failed to state a claim under either Pennsylvania[1] or Delaware law, and arguing that prior to filing suit, Plaintiff never claimed that he sought light duty work after he ceased working on

---

1. 42 PA. CONS. STAT. § 8371.

September 9, 2005.  (Id. at 5.)  Instead, Defendant notes that Plaintiff's prior argument had been that he was in "too much pain to continue even light duty work . . . and that his doctor told him to stay out of work."  (Id. at 6.)  Should this Court not grant summary judgment for the entirety of the Complaint, Defendant seeks denial of Plaintiff's request for attorney fees and costs.  Plaintiff responded to Defendant's Motion for Summary Judgment on June 27, 2008.

**II.   FACTUAL BACKGROUND**

On August 15, 2005, Plaintiff's lower back and neck were injured when a vehicle lost control and struck his van while parked in Philadelphia, Pennsylvania.  (Pl.'s Compl. ¶¶ 6, 8; Def. Mot. Summ. J. ¶¶ 1, 2; Pl.'s Resp. Mot. Summ. J. 1-2.)  Plaintiff's doctor, Jeffrey Siker, D.O., instructed him to stop work or limit himself to light duty work lifting no more than ten pounds.  (Pl.'s Compl. ¶ 8.)

At the time of the accident, Plaintiff, a union electrician, was working for Goldsmith Electric ("Goldsmith").  (Id. at ¶ 11.)  Despite his back injury, Plaintiff performed "light duty work," through September 8, 2005, when the job was completed.  (Id. at ¶ 11, 12; Pl.'s Resp. Mot. Summ. J. 3.)  A member of three union locals, Plaintiff asserts that his injuries "prohibited him from being able to perform his normal work and he was unable to make arrangements for light duty work" with any union local.  (Pl.'s Compl. at ¶ 13.)  In fact, Plaintiff claims that these union locals never posted light duty positions.  (Pl.'s Resp. Mot. Summ. J. 5.)  Unable to work for thirteen weeks, Plaintiff was cleared for a full range of work on December 12, 2005.  (Id. at 6.)

At the time of the accident, Plaintiff's van was covered by State Farm policy number 12 2310-C1108 which insured "the loss of wages or salary . . . the insured would have

earned in his or her regular work but not other income." (Pl.'s Compl. ¶ 4, 5; Def's Mot. Summ. J., Ex. B, State Farm Policy, Section II, Coverage P.) Plaintiff claims to have lost $34,621.60[2] in income due to the August 15, 2005, accident. (Pl.'s Compl. ¶ 14.) Following the accident, State Farm avers that it tried to contact Plaintiff at the Delaware address and phone number provided, but were unable to do so as Plaintiff had moved to Pennsylvania. (Def.'s Mot. Summ. J. 2.)

On November 21, 2005, Plaintiff filed an "Application for Benefits" which made a "loss of earning" claim. (Pl.'s Resp. Mot. Summ. J. 5.) With the application, Plaintiff provided an August 17, 2005, letter from Dr. Siker stating that "Mr. Hatchigian has been under my care since August 17, 2005, due to injuries incurred in a motor vehicle accident" and noting that "per my instruction he [Plaintiff] has been instructed to limit his work to light duty. He should not do lifting of more than 10 pounds." (Def's Mot. Summ. J., Ex. SF Documents, p. 4.)

On December 4, 2005, Defendant wrote stating that it had received Plaintiff's "Application for Benefits form," but asking for "your employer's complete mailing address" as we will "verify your wages and lost time from work through your employer." (Id. Ex. SF Documents, 11.) On December 14, 2005, Defendant wrote Goldsmith asking that it complete a "Wage and Salary Verification" form. (Id. Ex. SF Documents, 10.) The completed form indicated that Plaintiff was employed through September 8, 2005, and did not miss any work. (Id. Ex. SF Documents, 3.)

On January 11, 2006, Dr. Siker wrote a letter "to whom it may concern" stating that Plaintiff:

---

2. This figured was derived by this simple formula: (hourly pay rate) x (hours worked per week) x (number of weeks worked) or ($66.58) x (40) x (13). (Pl.'s Resp. Mot. Summ. J. 5.)

> has been under my care since August 17, 2005 due to injuries incurred in a motor vehicle accident. As per my instructions he has been instructed to limit his work to light duty from August 18, 2005. Beginning December 12, 2005, he was cleared to regular duties. He continues to have treatment in my office as he rehabilitates his injury.

(Id. Ex. SF Documents, 2.)

The same day, Ms. Hudson, a claims representative for Defendant, left Plaintiff a voice message indicating that a check covering lost earnings would be issued by Defendant. (Pl.'s Resp. Mot. Summ. J. 5.) This check was not issued. (Id.) Ms. Hudson later indicated that this voice message was issued before Goldsmith told Defendant that Plaintiff was laid off. (Def's Mot. Summ. J., Ex. SF Documents, Activity Log entered 2/10/06.) Activity log notes indicate that Plaintiff was told that lost wages would not be paid "if he was laid off," but Plaintiff continued to assert that he "stopped working because the dr. told him to stay oow [out of work]." (Id. Ex. SF Documents, Activity Log entered 1/13/06.)

On January 26, 2006, Plaintiff wrote Defendant detailing his efforts to provide Defendant with documentation supporting his claim and requesting "immediate payment of benefits." (Id. Ex. SF Documents, 24-25.) Plaintiff stated that he would file a formal complaint with the Delaware State Insurance Department "if I do not hear from you or receive payment in the next 10 days." (Id.) On March 2, 2006, Plaintiff wrote Matthew Denn, Delaware's Insurance Commissioner, detailing his correspondence with Defendant. (Pl.'s Resp. Mot. Summ. J. 6.)

Defendant wrote to Plaintiff, on February 1, 2006, stating that Goldsmith provided information indicating that he was "laid off." (Def.'s Mot. Summ. J., Ex. SF Documents, p. 9.) Further, "since you worked during the period you were temporarily disabled, and your job ended

4

on September 8, 2005, it appears you are not owed lost wages," but "[i]f you have additional information you would like for us to consider, please forward it to my attention." (Id.) Activity log notes indicate that Plaintiff "attempted to work light duty and could no longer work after 9-9-05 due to pain." (Id. Ex. SF Documents, Activity Log entered 2/10/06.)

On April 13, 2006, Frank J. Marcone, Plaintiff's counsel, wrote Defendant noting that

> between the date of the accident and December 12, 2005, Mr. Hatchigian, as stated above, mitigated your damages by successfully procuring "light duty" work from August 17, 2005 until September 8, 2005. Thereafter, the "light duty" work to which he had been assigned terminated. He was then assigned regular duty work which his injuries sustained in this accident prevented him from performing.

(Def.'s Mot. Summ. J., Ex. SF Documents, 22-23.) Defendant avers that there is no evidence that Plaintiff sought light duty work after September 8, 2005, but rather "his contention seemed to be that he was not required to continue to perform light duty as prescribed by his doctor, but rather, that he had done so voluntarily an as a favor to State Farm." (Def.'s Mot. Summ. J. 4.)

On May 12, 2006, Mr. Marcone wrote Defendant as he had not received a response to his April 13, 2006, letter and "[u]nless you respond within the following ten (10) days with a positive solution to your complete denial of this legitimate claim, I will have no alternative but to fiel (*sic*) an action in Federal Court seeking damages resulting from a 'bad faith' handling of Mr. Hatchigian's claim." (Id. Ex. SF Documents, 21.)

On May 19, 2006, Defendant replied stating that

5

> Mr. Hatchigian's employer confirmed he continued to work from August 17, 2005 through September 8, 2005. State Farm was advised by his employer that he was laid off because his job ended not because of his disability. Based on the information provided by the employer, Mr. Hatchigian's is not entitled to any additional lost wages from September 9, 2005 through December 12, 2005.

(Id. Ex. SF Documents, 8.) The letter further stated that "if you have documentation from the employer contrary to what State Farm has been advised please forward it . . . for review." (Id.)

On June 2, 2006, Mr. Marcone wrote a detailed letter explaining Plaintiff's understanding of the matter. (Id. Ex. SF Documents, 18-20.) He asserted that Plaintiff mitigated damages by performing light duty work, but once his job with Goldsmith ended "he was unable to work at his normal tasks since being a Union Electrician normally requires the employee exert himself beyond what Mr. Hatchigian was able to safely perform." (Id.) Counsel further averred that Defendant's refusal to pay Plaintiff's claim may be "based upon a lack of knowledge how a Union Electrician is employed" as the work is strenuous and light duties "usually come at the end" of a job. (Id.) On June 19, 2006, Mr. Marcone again wrote stating that he received no response to his June 2, 2006, letter, and "unless this matter is resolved in our favor within the next ten (10) days, I am instructed to file suit pursuant to a claim for 'bad faith'." (Id. at Ex. SF Documents, p. 18-20.)

On July 3, 2006, Defendant wrote stating "as State Farm has previously requested, in order to consider any claim for wages for Mr. Hatchigian, we will need the disability notes Mr. Hatchigian's doctor wrote concurrent with the times of his alleged disability." (Id. at Ex. SF Documents, 6-7.) However, "based on the information we have at this time, we are unable to

consider any additional claims for lost wages." (Id.) On September 17, 2006, Mr. Marcone wrote that Plaintiff "provided you with all the documentation you have requested and you have affirmative information . . . that he only was able to work on light duty assignments. Once those light duty assignments terminated, his obligation to mitigate damages ceased and he qualified for lost earnings." (Id. Ex. SF Documents, 16.)

On October 6, 2007, Mr. Marcone replied to Defendant's October 3, 2007, letter seeking proof of Plaintiff's "efforts to procure light duty work." (Pl.'s Resp. Mot. Summ. J., Ex. 10/6/07 Marcone Letter.) Mr. Marcone noted that he asked Plaintiff to "inquire with the persons who assign the jobs to see if he is able to procure a letter from them confirming his request" for light duty work. (Id.) Defendant responded on October 11, 2006, that no "additional information to support David Hatchigian's lost wage claim" had been received (Def.'s Mot. Summ. J., Ex. SF Documents, 5.)

On October 25, 2007, Mr. Marcone again wrote Defendant's counsel, and attached letters from officials at the three union locals to which Plaintiff belonged. (Id. Ex. F.) The October 9, 2007, letter from Charles Harvey, Business Representative for International Brotherhood of Electrical Workers ("IBEW") Local 98 stated that "IBEW Local Union 98 has no light duty classification." (Id. Ex. E.) An October 12, 2007, letter from Local 380's Business Representative, Fran Clark, stated that "IBEW Local Union 380 has many classifications. Unfortunately, none of these can be determined to be "***LIGHT DUTY***." (Id. (emphasis in original).) Dan Rafter, Assistant Business Agent for Local 654, wrote on October 12, 2007, that "IBEW Local Union 654 has no classification for light duty electricians." (Id.) Responding to

7

these letters, Defendant notes that none of them address whether "light duty work was available in 2005 or whether Mr. Hatchigian sought same through them." (Id. at 6.)

"Hearing no response," Defendant closed Plaintiff's claims file on November 16, 2006. (Id. at 5.) No further action was taken until "suit was filed on August 7, 2007." (Id.)

## III.  STANDARD OF REVIEW FOR A MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). For there to be a "genuine" issue, a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. (Id.)

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. County of Allegheny, PA, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993.) Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the court must accept as true the

allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." (Id. at 325.) Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "There must be sufficient evidence for a jury to return a verdict in favor of the non-moving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted. Arbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994), abrogated on other grounds, Showalter v. University of Pittsburgh Med. Center, 190 F.3d 231 (3d Cir. 1999).

IV.   DISCUSSION

    A.   **Choice of Law**

Defendant states that "Plaintiff has asserted a claim for damages under Pennsylvania's bad faith law, 42 PA CONS. STAT. § 8371.[3]" (Def.'s Mot. Summ. J. 8.) While

---

3. The Pennsylvania statute provides: In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
       (1) Award interest on the amount of the claim from the date the claim
       was made by the insured in an amount equal to the prime rate of interest
       plus 3%.
       (2) Award punitive damages against the insurer.
       (3) Assess court costs and attorney fees against the insurer.
42 PA. CONS. STAT. § 8371.

asserting that Plaintiff cannot recover under Pennsylvania law, Defendant argues that Delaware, not Pennsylvania law, applies as the policy was issued pursuant to Delaware law, and Plaintiff was a Delaware resident at the time of the policy's issuance. (Id. at 8-9 (citing Anderson v. State Farm Mut. Auto. Ins. Co., Civ. A. No. 00-4518, 2001 WL 1526280, at * 2 (E.D. Pa Nov. 29, 2001.).)

Plaintiff's Response to Defendant's Motion for Summary Judgment also argues for application of Delaware law. Plaintiff notes that Defendant asserts that "plaintiff's suit must be dismissed since he has asserted his claim 'under Pennsylvania's bad faith law'" even though "there is absolutely no reference to the Pennsylvania Statute nor any reference to seeking recovery under a Pennsylvania Statute" in the Complaint. (Pl.'s Resp. Mot Summ. J. 14.) Plaintiff further asserts that while the Complaint "may have mentioned Pennsylvania law however there is nothing in the Complaint which could be construed even remotely seeking recovery based upon Pennsylvania law" as this reference to Pennsylvania law "is simply to note that Delaware has no applicable statutory law however often in cases where there is a question of legal precedence, the law of a sister state could be the basis for comparison." (Id. at 15-16.)

This Court disagrees with Plaintiff's assertion that nothing in the Complaint "even remotely" suggests that Plaintiff seeks "recovery based upon Pennsylvania law." (Id. at 14.) Rather, looking at the Complaint it is hard to discern any semblance of a claim brought under Delaware law, as the word "Delaware" is absent from the Complaint. The Complaint states that Defendant "violated the law related to good faith dealing and fair dealing with Plaintiff," and evidenced "bad faith under the Pennsylvania law . . . as defined by law and by common practice, and common law." (Pl.'s Compl. at ¶¶ 25-27.) Nowhere in the Complaint does Plaintiff indicate

that "the law of a sister state" was used as "the basis for comparison" with Delaware's common law approach to bad faith claims. (Pl.'s Resp. Mot. Summ. J. 16.) This Court is left with a Complaint, filed in the Eastern District of Pennsylvania, that only refers to "Pennsylvania statute" and the "common law." (Id.) Given the vagaries of Plaintiff's Complaint, it would appear that Plaintiff sought relief under Pennsylvania and not Delaware law.

Notwithstanding the Complaint, the parties seek to have Delaware law applied. This Court's choice of law analysis is guided by the Third Circuit's decision in Assicurazioni Generali, S.P.A. v. Clover, 195 F.3d 161 (3d Cir. 1999). The insurance policy in that case did not contain a choice of law provision, however, the Court of Appeals noted it was drafted in accordance with Indiana law because it included the underinsured endorsement required by that state. Finding that Pennsylvania in large measure followed the Restatement (Second) Conflict of Laws, which holds that a contract's references to the laws of a particular state may provide persuasive evidence that the parties to the contract intended for that state's law to apply, the Third Circuit concluded that the district court should have considered the content of the endorsement itself rather than an interest analysis as determinative of the choice of law question. Thus, the Third Circuit reasoned, Indiana law should have been applied. See Clover, 195 F.3d at 164-65.

In this case, State Farm's automobile insurance contract contained no specific "choice of law" provision. The policy, however, contains numerous provisions explicitly referring to Delaware law, Delaware or Delaware's Insurance Commissioner. In "Section II – No-Fault – Coverage P," the policy states that "[w]e will pay in accordance with Subchapter 1, Chapter 1, Title 21, of the Delaware Code for ***bodily injury*** to an ***insured*** caused by accident."

11

(Def.'s Mot. Sum J., Ex. B, 10 (emphasis in original).)  The policy provided for arbitration "if the *insured* sends a written request for arbitration to the Delaware Insurance Commissioner."  (Id., Ex. B, 10, 21 (emphasis in original).)  Reference to Delaware is made under the section entitled "Other No-Fault Coverage Available From Other Sources," and the Delaware State Treasurer and the Delaware Motor Vehicle Safety Responsibility Law are mentioned in "Section III – Uninsured Motor Vehicle – Coverage U."  (Id. Ex. B, 11, 13.)

Like the Third Circuit in Clover, this Court finds that the language of State Farm policy 12 2310-C11-08 clearly determines the outcome of the choice of law issue.  The Court sees no need to undertake a detailed interest analysis.[4]  Accordingly, the Court will apply Delaware law in interpreting the State Farm insurance policy.

### B.     Bad Faith Claims Under Delaware Law

---

4.  That said, a cursory application of interest analysis reaffirms this Court's determination that application of Delaware law is correct.  Applying Pennsylvania's choice of law rules, the Court must consider the qualify and quantity of each state's contacts with the dispute at issue.  Hammersmith v. TIG Ins. Co., 480 F.3d 220, 231 (3d Cir. 2007).  Examining each state's contacts, "we are concerned with the contract of insurance" and not any underlying tort.  McCabe v. Prudential Prop. & Cas. Ins. Co., 514 A.2d 582, 586 (Pa. 1986).  The Restatement (Second) of Conflicts of Law directs that courts in the absence of an effective choice law clause take the following contacts into account: (1) the place of contract; (2) place of contract negotiation; (3) place of performance; (4) location of subject matter of contract; and (5) domicile of the parties.  REST 2d (SECOND) CONFLICTS § 188 (1971).  The record provided by Defendant, and not contested by Plaintiff, is that Plaintiff, at the outset of this policy was a Delaware resident living at 205 Bell Ringer Court; Newark, Delaware.  (Def.'s Mot. Summ. J. ¶ 5.)  Defendant's records indicate that correspondence addressed to Plaintiff "at the DE address was" returned "as not deliverable as addressed.  (Def.'s Mot. Summ. J. Ex. SF Documents, Activity Log entered 9/27/05.)  The record suggests that Delaware was likely the place of contract and the place of contract negotiation.  It is clear that Delaware was the place where notice should have been provided, the location of the subject matter of the contract, and original domicile of Plaintiff.  As a result, factors (3) - (5) lean towards Delaware, and it is likely that factors (1) and (2) lean towards Delaware as well.  Weighing these contacts on a "qualitative scale," Delaware has a more significant relationship to the insurance contract than Pennsylvania.  Looking at the interests and policies of the affected states, Delaware likely also has the greater policy interest.  Pennsylvania's bad faith law expressly excludes from its ambit non-residents and out of state policies.  See Jaber v. Nationwide Mut. Fire. Ins. Co., 2005 WL 2031270, * 1 (M.D. Pa. July 20, 2005) (refusing to apply Pennsylvania's bad faith law in a diversity action brought by Florida resident under a policy issued in Florida.)  On the other hand, Delaware has an interest in seeing insurance contracts, entered into in Delaware by Delaware residents, given full effect.

Unlike Pennsylvania, Delaware does not have a statute addressing "bad faith" insurance claims. Rather, in Delaware, a "bad faith" insurance claim "sounds in contract and arises from the implied covenant of good faith and fair dealing." Coleman DuPont Homsey v. Vigilant Ins. Co., 496 F. Supp. 2d 433, 437 (D. Del. 2007) (quoting Dunlap v. State Farm Fire & Cas. Co., 878 A.2d 434, 440 (Del. 2005) (citing Tackett v. State Farm Fire & Cas. Co., 653 A.2d 254 (Del. 1995). A bad faith claim entails that the insurer "failed in bad faith to investigate or process the claim or to have delayed in its obligation" such that denial of benefits was "clearly without any, reasonable justification." Tackett, 653 A.2d at 264 (citing Casson v. Nationwide Ins. Co., 455 A.2d 361, 369 (Del. Super. Ct. 1992).)

While a plaintiff may recover for breach of contractual obligations, Delaware courts provide that punitive damages are recoverable only in "egregious cases of wilful or malicious breach of contract." Casson, 455 A.2d at 368 (noting that while "no Delaware case has directly addressed this issue. . . given a proper set of circumstances, our courts would authorize recovery of punitive damages in egregious cases of wilful or malicious breach of contract."); Tackett, 653 A.2d at 256 ("punitive damages may be recoverable for intentional or malicious breach of a contract of insurance.").

The validity of the insurance contract is not in dispute. Both parties concede that Plaintiff's chiropractor instructed Plaintiff "to limit his work to light duty from August 18, 2005" and that beginning December 12, 2005, he was "cleared to regular duties." (Def.'s Mot. Summ. J., Ex. SF Documents, 2.)

Likewise, the parties do not dispute that Defendant reversed its decision to provide Plaintiff with payment for thirteen weeks of lost earnings. Plaintiff argues that this reversal was made even though he "made a proper claim for coverage and reimbursement for his loss of earnings." (Pl.'s Compl. ¶ 14.) Plaintiff avers that the "claim was for a loss occurring within the stated policy provisions and proof of claim was submitted to the Defendant insurance company." (Id. at ¶ 16.) Yet, "Defendant insurance company, by its' agents, servants and employees has refused to pay the properly presented loss" resulting in the denial of coverage and payment "constituting the breach of contract which resulted in an act of Bad Faith by the Defendant company." (Id. at ¶¶ 17, 18.)

Conversely, Defendant argues that it reversed its decision to provide payment for lost earnings only after learning from Plaintiff's employer that he ceased working not because he was injured but rather because he was laid off. (Def's Mot. Summ. J., Ex. SF Documents, Activity Log entered 1/13/06.) Ms. Hudson noted that she told Plaintiff "we would not owe him wages if he was laid off." (Id.) Defendant claims that Plaintiff did not respond to its February 1, 2006, letter asking Plaintiff "to submit further information, should there be any, in support of his claim." (Def.'s Mot. Summ. J. 3 & Ex. SF Documents, 9.) In fact, Defendant argues that prior to filing suit, Plaintiff never claimed that he made efforts to obtain light duty work after he ceased working on September 9, 2005. (Id. at 5.) Instead, Defendant notes that Plaintiff's prior argument was that he was in "too much pain to continue even light duty work . . . and that his doctor told him to stay out of work." (Id. at 6.) While Plaintiff later submitted, as evidence, letters, written in 2007, from officials at three of the union locals stating that they had no "light

duty" work, Defendant notes that these letters do not address whether they had such work in 2005. (Def.'s Mot. Summ. J. 6.)

Based on the pleadings, it is clear that there exist genuine issues of material fact warranting the denial of summary judgment. The parties agree that Plaintiff last worked on September 8, 2005. What is unclear is whether or not Plaintiff was "laid off" or whether he was unable to find employment because his injuries limited him to "light duty" work and none was available. If the former holds true, Plaintiff would not qualify for insurance benefits. If the latter situation is correct, he would likely qualify for lost earnings payments. Factual disputes regarding Plaintiff's ability to work, whether he sought light duty work, as well as his obligation to mitigate lost income remain. Given legitimate disputes regarding these factual matters, summary judgment is denied.

### C. Attorney's Fees

Defendant notes that "[a]ttorney's fees and litigation costs are not automatically awarded to a plaintiff even should he prevail on his claim in chief." (Def.'s Mot. Summ. J. 11.) In fact, Defendant avers that "under Delaware law, attorneys fees and litigation costs are never appropriate items of damage in a first party bad faith action absent a contractual agreement, statutory authority, or court rule imposing such damages." (Id. (citing E.I. DuPont v. Admiral Ins. Co., 1994 WL 465547, * 6 (Del. Super. Aug 3, 1994.))) Given the absence of any contractual agreement, statutory authority, or court rule mandating an award of attorney fees or costs, Defendant argues that "judgment should be entered for defendant on those claims." (Id.)

Plaintiff counters that Delaware courts have modified the holding of Admiral Ins. Co. permitting the award of fees in "cases where the underlying (pre-litigation) conduct of the losing party was so egregious as to justify an award of attorneys' fee as an element of damages, and cases where the court finds that the litigation was brought in bad faith or that party's bad faith conduct increased the costs of litigation." (Pl.'s Resp. Mot. Summ. J. 21 (citing Arbitrium (Cayman Islands) Handels AG v. Johnston, 705 A.2d 225, 231 (Del. Ch. 1997.)))

Under the "American Rule," parties to litigation are to pay their own attorneys' fees and costs, absent statutory authority and a court order providing otherwise. Buckhannon Bd. and Care Home, Inc. v. West Virginia Dep't. of Health and Human Resources, 532 U.S. 598, 602 (2001). There are exceptions to this rule, and courts in Delaware have "broad discretion to award attorneys' fees where litigation was brought in bad faith or where bad faith conduct by one of the parties increases the costs of the litigation." In re § & C Tech., Inc. Shareholders Litig., 948 A.2d 1140, 1149 (Del. Ch. 2008); see also Arbitrium (Cayman Islands) Handels AG v. Johnston, 705 A.2d 225, 231 (Del. Ch. 1997); Openwave Systems, Inc. v. Harbinger Capital Partners Master Fund I, Ltd., 924 A.2d 228, 245 (Del. Ch. 2007) ( "While the award of attorneys' fees is 'unusual' relief, the Court of Chancery has broad discretion in making such awards."). "To award fees under the bad faith exception, the party against whom the fee award is sought must be found to have acted in subjective bad faith. A finding of bad faith involves a higher or more stringent standard of proof, i.e., 'clear evidence.'" Arbitrium, 705 A.2d at 232.

Given the outstanding question of whether or not Plaintiff has raised a valid bad faith claim regarding nonpayment of an insurance claim, it is premature to determine whether

Plaintiff should be awarded attorney fees. Accordingly, Defendant's Motion for Summary Judgment seeking that Plaintiff be denied recovery of attorneys' fees and costs is denied.

## V.  CONCLUSION

For the reasons discussed above, Defendant's Motion for Summary Judgment is denied in its entirety. An order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID HATCHIGIAN, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | NO. 07-3217 |
| v. | : | |
| | : | |
| STATE FARM INSURANCE COMPANY, | : | |
| Defendant. | | |

## ORDER

**AND NOW**, this 25th day of *November*, 2008, upon consideration of Defendant State Farm Insurance Company's ("State Farm") Motion for Summary Judgment (Doc. No. 15), and Plaintiff, David Hatchigian's Response to Defendant's Motion for Summary Judgment (Doc. No. 17), it is hereby **ORDERED** that Defendant's Motion is **DENIED** in its entirety.

BY THE COURT:

*s/ Ronald L. Buckwalter*
RONALD L. BUCKWALTER, S.J.